OPINION OF THE COURT
Lee H. Elkins, J.
This 16-year-old respondent comes before the court for disposition following his admission to criminal possession of a weapon in the second degree (Penal Law § 265.03 [1] [b]). The respondent, who was 15 at the time of the conduct, has no prior findings. The attorney for the child argues that he should be released to his grandmother under the supervision of the department of probation. The corporation counsel argues that the respondent should be placed with the Office of Children and Family Services (OCFS) for 18 months, with a six-month minimum, in a limited secure facility. (Family Ct Act § 353.3 [9].) After an extensive dispositional hearing, the court makes the following findings and orders.
Respondent’s History
John S. was first placed into foster care when he was four. His mother has a history of substance abuse and incarceration. He was abandoned by his father. John reported being physically and sexually abused and locked in a dark closet for extended periods in a foster home, which was subsequently delicensed. John returned to the care of his mother at age six. John was exposed to domestic violence against his mother while residing with her in the shelter system. As a result of these experiences, John is hypervigilant and diagnosed with post-traumatic stress disorder (PTSD). He perceives his environment as threatening. He has difficulty regulating his anger and emotions. He acts out through intimidation and violence.
John returned to foster care in 2006 following his mother’s incarceration. He is placed in the kinship home of his maternal grandmother. In May 2007, John was arrested in connection with an altercation with his mother, and subsequently referred to Pleasantville DRC for an evaluation. The diagnostic report noted that John “has a history of chronic fighting in the *539 neighborhood and in school,” one psychiatric hospitalization and two psychiatric emergency room admissions “due to episodes of violence and physical aggression.” John was able to conform his behavior to the rules at Pleasantville. A psychological evaluation at Pleasantville noted that John has insight into his conduct disorder and is amenable to treatment. The evaluation recommended weekly individual therapy with emphasis on his history of trauma. The evaluation noted that John does well in a structured environment in a small setting, and suggested a private school. A psychiatrist who met with John at Pleasantville found him accessible, willing to consider the effect of his history on his behavior, and capable of change;
John’s problems with aggression toward school staff and peers began when he was in the second grade and continued through his current school setting. John is in special education, with a classification of learning disabled. He has average intelligence. John has a history of suspensions and expulsions for fighting. Nonetheless, the dean of students at Brooklyn Collegiate in a November 2009 letter stated that John began making an effort to comply with school rules and his attendance was 70%. The dean noted that John is honest in recognizing his problems and desperately in need of guidance and a supportive environment, including remedial education.
While at Pleasantville, John stated to the evaluator that he had been but was no longer in a gang. However, upon leaving Pleasantville and being referred to the Institute for Community Living for outpatient mental health services, John stated he was unable to attend due to “territorial” issues with the clinic location. His grandmother informed the department of probation that John associates with negative peers and stays out until four in the morning. John was arrested for two incidents occurring a week apart in September 2009. One occurred at 2:42 in the morning. During the same week, a friend of the respondent was shot to death in Brooklyn. Approximately two months prior to the incident for which he is before the court, John was stabbed five times in the upper body. In the incident before the court, the respondent admittedly possessed a loaded operable firearm with intent to use it unlawfully against another person. The incident occurred at 1:45 a.m. outside of a nightclub in Brooklyn. After hearing gunshots, police officer Gingo observed the respondent run from the location and throw a .45 caliber semiautomatic pistol, which showed evidence of discharge. Shell casings matching the gun were found at the lo *540 cation. The respondent told the interviewing probation officer that he shot at males in a car, believing one of them to be the person who stabbed him.
Legal Analysis
John S. was not found to have committed a designated felony act. Therefore, Family Court Act § 352.2 (2) (a) requires that “the court shall order the least restrictive available alternative enumerated in subdivision one which is consistent with the needs and best interests of the respondent and the need for protection of the community.” The governing principle of the “least restrictive alternative” includes not only the decision whether to place the respondent in a more or less restrictive environment, but also necessarily includes consideration of the services available to the respondent in any facility where he is placed. (See e.g. Matter of Andre L., 64 AD2d 479 [1st Dept 1978]; Matter of Nicolette R., 9 AD3d 270 [1st Dept 2004]; and see Matter of Sandra XX., 169 AD2d 992, 994 [3d Dept 1991] [finding in a PINS proceeding that “a placement, if necessary, should be at a facility or with an agency capable of providing services tailored to the child’s special needs”].) This is apparent from the decision in Matter of Andre L. (supra), where the majority opinion observed that the statute establishes “a dual standard requiring that the court take into account two fundamental concerns, i.e., the needs and best interests of the juvenile balanced with the need to protect the community against perpetrators of serious crimes. The appropriate remedy is the least restrictive confinement consonant with both purposes.” (64 AD2d at 481.) In Matter of Andre L., the Appellate Division ordered the respondent discharged from a restrictive placement and remitted to the Family Court for a new dispositional hearing at which the department of probation was “to conduct a further investigation and to report as to whether there were available any facilities with appropriate psychotherapy treatment programs and which also had suitable security measures found to be necessary.” (Id. at 481.) In Matter of Andre L., it was undisputed that the juvenile required therapeutic treatment in a one-to-one ongoing psychotherapy program. The appellate court remitted because although the trial court found that the safety of the community required Andre to be placed in a secured facility, the court overlooked “the possibility of accommodating both the needs of the community and needs of the juvenile by directing placement in a secure facility equipped to render appropriate therapeutic treatment.” (Id. at *541 481-482.) Significantly, the majority took issue with the approach of the dissent, which was to place Andre in a secure OCFS facility on the assumption that the needed therapeutic services would be provided “in the face of a record that the recommended specialized psychiatric treatment found to be necessary is not available at [such] facilities.” (Id. at 482.)
Here, the court has determined that protection of the community requires the respondent’s placement in a supervised setting. (See e.g. Matter of Katherine W., 62 NY2d 947 [1984]; and see generally Sebastian v State of New York, 93 NY2d 790, 795 [1999] [“while the rehabilitative goal of the Family Court Act retains its pre-eminence, that objective is not exclusive. Statutorily, the protection of the community must be factored into the analysis”].) An “exploration of placement” conducted by the department of probation reveals that no private agency would accept the respondent. OCFS deemed the respondent unsuitable for nonsecure placement. Given that proscription (see Executive Law § 504), the only alternative available to the court is placement with OCFS in a limited secure facility. (Cf. e.g. Matter of Nicolette R., supra, 9 AD3d 270 [2004].) The attorney for the child John S. cites an August 14, 2009 letter from the United States Department of Justice to the Governor of the State of New York containing the results of DOJ’s Civil Rights Division investigation into four OCFS facilities[1] (DOJ letter), conducted under the Civil Rights of Institutionalized Persons Act (42 USC § 1997), finding that these OCFS facilities provide inadequate treatment planning and services for children with diagnosed mental illnesses, including PTSD. The attorney for the child argues that this precludes the court from placing John S. in the care of OCFS.
In the court’s view, there is only one solution to this apparent dilemma. The court must have the authority to direct that John S. receive psychiatric and psychological services necessary to his rehabilitation in situ at the OCFS facility where he is placed, and ancillary authority to monitor the provision of those services. This authority derives directly from the statutory prescription that the respondent’s placement be governed by the principle of the least restrictive alternative and from the court’s explicit statutory power to call upon OCFS to report to the court regarding services provided to children entrusted to the agency by the Family Court.
*542 As recently noted by the Appellate Division, Second Department,
“[although the Family Court Act was amended in 1976 to require the need for community protection to be considered in ordering placement for a youth who has been adjudicated a juvenile delinquent, ‘the rehabilitative goal of the Family Court Act retains its preeminence.’ (Sebastian v State of New York, 93 NY2d 790, 795 [1999]). In keeping with this preeminent goal, all facilities operated by the New York State Office of Children and Family Services for alleged and adjudicated juvenile delinquents are required to provide for the ‘care, custody, treatment, housing, education, rehabilitation and guidance’ of such youths (Executive Law § 504 [1]).” (Matter of Dylan C., 69 AD3d 127, 135 [2d Dept 2009] [emphasis added].)
This right to treatment is a corollary of the principle of the least restrictive alternative, which in turn is a function of substantive due process. (See e.g. Matter of Kesselbrenner v Anonymous, 33 NY2d 161, 167 [1973].) In Jackson v Indiana (406 US 715, 718 [1972]), in the context of a criminal prosecution where the defendant was found incompetent to stand trial and under Indiana law to be detained until “sane,” the Supreme Court held that the defendant could only be detained as long as continued commitment could be justified by progress toward the goal of rendering the defendant competent to stand trial through treatment. The Court held that “[a]t the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed.” (Id. at 738.) The principle that there is a substantive due process right to treatment has been extended to the placement of juvenile delinquents (see e.g. Pena v New York State Div. for Youth, 419 F Supp 203, 207 [SD NY 1976] [“the detention of a youth under a juvenile justice system absent provision for the rehabilitative treatment of such youth is a violation of due process rights guaranteed under the Fourteenth Amendment”]), particularly where the legislatively declared purpose of placing juveniles in a secure setting includes treatment and rehabilitation. (See e.g. Alexander S. By & Through Bowers v Boyd, 876 F Supp 773, 796 [D SC 1995].) It follows from these principles that a juvenile is not to be restrictively placed unless the needs of the community require it. (Matter of Gomez, 131 AD2d 399 [1st Dept 1987].) It also follows that the conditions of placement may not be punitive nor exclusively *543 designed to incapacitate, but must include treatment and rehabilitation consistent with the needs and best interests of the juvenile. Where the court finds that the juvenile is in need of psychiatric or psychological treatment, such finding is part of the court’s analysis of the least restrictive alternative and the order must include the provision of such necessary services. (See Hafemeister, Parameters and Implementation of a Right to Mental Health Treatment for Juvenile Offenders, 12 Va J Soc Pol’y & L 61 [2004].)
Consequently, based upon the respondent’s history of psychiatric and psychological treatment while in the community, his diagnosis of PTSD, the recommendation of the evaluations at Pleasantville DRC that John S. receive weekly therapy focusing on his history of trauma, and the recommendation of the court’s mental health clinic that John’s placement “address his psychiatric difficulties,” the court finds that the least restrictive alternative in this case must include psychiatric evaluation and treatment and psychological counseling in keeping with these recommendations.
If the court finds that the least restrictive alternative is not being implemented by failure to provide necessary services, the court may reconsider this placement on motion of the lawyer for the child, or on its own motion at any time. (See Matter of Lavette M., 35 NY2d 136, 143 [1974] [“our decision is without prejudice to an application to the Family Court for appropriate relief should it appear at any time that adequate treatment and supervision is not being provided”].) Given the court’s finding that treatment is necessary in the best interests of John S. to address his history of trauma, which is a significant factor in his need for placement, failure to provide appropriate treatment would constitute a change of circumstances warranting a new dispositional hearing. (Family Ct Act § 355.1.) Ancillary to its finding that the respondent is in need of treatment, the court will direct the facility where the respondent is placed to report to the court regarding the services provided to the respondent every 90 days. (See Matter of Lavar C., 185 AD2d 36 [4th Dept 1992].)
Order
Respondent is placed with OCFS limited secure for a period of up to 18 months, with credit for time in detention. The court finds that it is contrary to the best interests of the respondent to remain in his current kinship foster home, as he is beyond *544 the control of his foster mother and presently is a danger to the community.
The court finds that reasonable efforts[2] were made to maintain the respondent in the community, through JCCA and the waiver program, and efforts to provide psychiatric and psychological services. The court finds that placement with OCFS limited secure is the least restrictive alternative, noting that the respondent previously had been placed in Pleasantville DRC and in foster care with SCO Family of Services. Following his release from Pleasantville, John was referred to outpatient counseling at the Institute for Community Living.
The court finds that the respondent is in need of treatment, in addition to supervision and confinement. Consequently, the court directs that the respondent receive a psychiatric evaluation to include a review of records to be provided by SCO Family of Services; that the respondent receive psychiatric care as indicated in the evaluation; and that the respondent receive psychological counseling by a licensed professional at a minimum weekly as recommended by the Pleasantville DRC, which must take into consideration his history of trauma.
The court directs that OCFS provide to the court, the presentment agency, the attorney for the child and to SCO Family of Services as the respondent’s legal guardian, every 90 days, a status report on the psychological and psychiatric services provided to the respondent, including a schedule of therapy sessions, a summary of diagnosis and treatment, and a schedule of medications with proof of informed consent by the respondent’s legal guardian. Representatives of SCO Family of Services as the respondent’s legal guardian are to have access to the physician prescribing any medication. OCFS is also to inform SCO Family of Services of the location of the respondent’s placement and is to provide access by SCO Family of Services staff to the respondent, as he remains in foster care. (See Matter of Commissioner of Social Servs., 171 Misc 2d 278 [Fam Ct, Queens County 1996].)
In light of the DOJ letter, and in the exercise of its parens patriae power to ensure the welfare of John S., the court also *545 directs that OCFS provide to the court, the presentment agency and the attorney for the child, monthly reports of all disciplinary measures taken in regard to John S., including the use of restraints. This information is necessary in order for the court to assess whether placement continues to be in the best interests of John S., given his diagnosis of PTSD. (See Matter of Lavar C., supra, 185 AD2d 36 [1992]; Matter of Lavette M., supra, 35 NY2d 136 [1974].)
The court directs the attention of OCFS to the respondent’s special education status, and to the individualized education program (IEP) of October 2009. The court notes the observation of the dean of students at Brooklyn Collegiate in November 2009 that John is in need of remedial educational services. If John remains in placement, he will require a new IEP in October 2010.

. The facilities are Lansing Residential Center, Louis Gossett, Jr. Residential Center, and Tryon Residential Center (“Boys” and “Girls”).

. While these findings are not required when the juvenile is placed initially in a limited secure setting, which is not eligible for title IV-E funding, such findings will permit the State to receive reimbursement for the respondent’s care in the event he is “stepped down” to a nonsecure setting. The court thanks Janet Fink, Deputy Counsel to the Family Court, for this suggestion.